## Case No. 16,943.

### The VILLE DU HAVRE.

[7 Ben. 328.] [1]

District Court, E. D. New York. April, 1874.

COLLISION IN THE PORT OF NEW YORK — VESSEL AT ANCHOR IN CHANNEL—LIGHTS—LOOKOUT —NIGHT-GLASSES—EVIDENCE.

1. A bark, lying at anchor at night in the swash channel, in the entrance to the port of New York, was sunk by being run into by a steamship entering the port. No light was seen on the bark by those on the steamship, and it was claimed that she had none. The steamer

1 [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

had two lookouts stationed forward, and her master and a lieutenant were on the bridge. Her second captain was forward also, and the pilot was also on deck. The night was clear. None of the officers used the night-glasses which they had, to examine the channel ahead of them. If they had they would have been able to see the bark, even without a light, sooner than she was seen: *Held*, that, on the evidence, it must be held that the light on the bark had become dim, so as not to be a good light.

2. The failure of the officers of the steamer, under the circumstances of this case, to use a night-glass, was negligence.

3. Both vessels were in fault, and the damages must be apportioned.

4. The failure to call a witness whose duty it was to have charge of the light, warrants the inference that his evidence would have weakened the case of the bark in reference to the light.

In admiralty.

Evarts, Southmayd & Choate, for libellants.

W. L. Livingston and C. Donohue, for claimants.

BENEDICT, District Judge. This is an action to recover of the French steamer Ville du Havre the sum of $73,000 damages, caused by the sinking of the bark Curacao, in a collision which occurred between those vessels, in the port of New York, on the 3d day of June, 1873. On the evening of the 2d of June, the bark Curacao came to anchor in the swash channel, about one-third of the way from the lower end and near the middle of the channel, with room for vessels to pass her on either side. She there remained until two o'clock next morning, when the steamship Ville du Havre, coming in from sea, ran into and sunk her. The accident is claimed, by each vessel, to have arisen from carelessness on the part of the other. Several charges of negligence are made on each side.

I shall consider, first, the charge made against the bark, that she had no proper light displayed, and thereby caused the accident. The bark was anchored in a fairway, at night, and is, of course, called on to show that she maintained while there a signal light properly set and burning brightly. This burden she has assumed, and her libel alleges and she claims to have proved that she performed her duty in this respect.

Upon this question a mass of evidence has been presented to me, which I have considered in all its aspects, and I can say, with the advocates of the bark, that it is seldom indeed that a vessel at anchor is able so clearly to prove the setting of a light and the maintaining of the same for so long a period in the night as is covered by the testimony produced by the libellants in this case.

The evidence proves that a bright light was set on this bark when she came to anchor, and that it was there and burning brightly up to nearly the time of the accident. But the point of the inquiry is as to the condition of the light at the time of the accident; that is to say, from half past one to two o'clock in the morning of the 3d of June. When the inquiry is thus limited, the testimony in support of the libellants'

averment is largely reduced both in quantity and quality.

One of the witnesses from on board the bark, who speaks as to the condition of the light, is Melani, who says that about fifteen minutes before the collision he came out of the forecastle and went to the head, and in a few minutes returned to the forecastle. That as he returned he saw the light in the rigging burning brightly, and also that he saw two men on the deck—one of them by the galley. But he also says that when he returned to the forecastle he went to sleep and was awakened by the alarm given by the watch on deck when the steamer was upon them. The value of the testimony of this witness, as bearing upon the question at issue depends upon the accuracy of his estimate of the length of time he was asleep after he returned to the forecastle, and before the alarm was given. Very little reliance can be placed upon an estimate of time made, no matter by whom, under such circumstances. In this instance, the witness's opinion as to the time he was on deck appears clearly wrong, for he does not speak of seeing the steamer while he was at the head, when, if his opinion of the time be correct, she was in plain sight and quite certain to attract his attention. Furthermore, during the time he was below after his return to the forecastle, Hartman, the watch on deck, came into the forecastle and shook the man who was to succeed him on watch until he awakened him and the latter arose and began to dress, of all which Melani knew nothing.

The evidence of this witness appears, therefore, to be of little value to prove the condition of the light at the time in question.

Another witness called by the bark, who undertakes to speak of the condition of the light at the time of the collision, and who gives testimony of much more value, is the seaman Hamester, who, after the steamship was in sight, was awakened by Hartman that he might follow him upon watch. This witness says that while he was dressing in the forecastle after he was awakened, he was enabled to see Hartman standing on deck by the reflection of the signal light upon him, and that when he himself put his head out of the hatch at the instant of the collision, he saw the signal light. But he says no more than that he could see the light, and does not state whether it was burning brightly or not. Still another witness called by the libellants to the same point, is Peterson—a seaman on the bark, who says that he saw the light after the blow, but, like the previous witness, he proves no more than that a light was there which he could see. The remaining witness on this point is Hartman, whose watch on deck it was at the time of the collision, and whose positive statement that the light was burning brightly when the steamer struck them, must be considered in connection with the fact that any failure to maintain the light would be chargeable to him alone. This is the sum of the evidence on the part of the libellants in regard to the particular time in question. Many

other witnesses testify to seeing the light during the night, but a close examination of their testimony shows that none of them can be relied on as giving positive evidence in respect to its condition within a half hour of the accident. Still, the testimony of the witnesses above mentioned, coupled with the strong evidence adduced to show that a light was set upon the bark when she anchored, and was seen by other vessels near to the time of the collision, may be claimed to furnish proof that at the time of the collision the light was still in the rigging and burning so that it could be seen from the deck of the bark. But more than this cannot be found proved by the testimony offered by the libellants. This testimony is fairly harmonized with the testimony of those on the steamer, who say that as they approached the bark no light was to be seen upon the bark, by the statement of a witness called by the libellants, the pilot on the bark, who says that a moment or two after the blow he climbed into the bark's main rigging, and adds, "I could see the light then burning, but it was burning dim." No evidence is produced to show that the lantern was broken or its light diminished by the jar of the collision, and any inference that the condition of the light testified to by this pilot might be the result of the collision is overcome by the strong evidence from the steamer, that, as she approached the bark and before the blow, no light was to be seen. Some eight witnesses are called from the steamer, including seamen, officers, passengers and the pilot, every one of whom sooner or later had his attention fastened upon the bark before the blow, and every one is positive that no light was displayed by the bark.

I reconcile the evidence, therefore, by the testimony of the pilot of the bark, and find the fact to be that while there was a light placed in the bark's rigging, which burned brightly till near the time of the collision, still, that at the time of the steamer's approach the light had become dim, so as to be invisible at any distance from the bark.

This conclusion derives much support from the fact proved, that either from want of oil, a short wick, or other cause, the light in question had become dim once before during this night, and it had been found necessary to take it down and trim it. The cause of the first failure of the lantern is not stated. The lamp was then filled, the wick was cut, not renewed, and a short wick would account for the failure on both occasions. It is also to be remarked in this connection, that the steward, whose duty it would be to put the lantern in condition to be placed in the rigging, is not called as a witness, nor is his absence explained. This circumstance is made significant by some minor facts in evidence. Thus it would seem that no long time before the collision, although before the steamer hove in sight, the steward was on deck, for Melani says that when he was on deck in Hartman's watch, he saw two men there, and one of them by the galley. All

persons on board except the steward have been called, and none of those except Melani speak of having been on deck in Hartman's watch. Furthermore, something which is not explained by the evidence occurred after the blow to detain the steward, so that he failed to get into the boat in time to leave with the captain and the rest of the crew. He was afterwards picked up by the crew of the steamer, to whom he then stated that, "he had just been lighting the lamp," and it appears in evidence that after the blow, some one did take down the lamp and trim it, for when the captain of the bark returned to his vessel after going to the steamer, he says the signal lantern was used on deck to give him light through the cabin skylight. These facts can be stated to afford ground for the supposition that shortly before the steamship hove in sight, the light on the bark began to go down, as it had done before,—that the steward came on deck to trim it, Hartman, the watch on deck, being unable to do so by reason of the sore hand which he speaks of,—that he did not then take down and trim the light, perhaps because the steamer then appeared in sight; but after the blow, and when the condition of the light was noticed by the pilot, he attempted to trim it, and so was left—and then, when picked up, he naturally explained his being left to those who picked him up by the statement that he "had just been lighting the lamp." Whether such a supposition as this be correct or not, would appear by an examination of the steward; and although the failure to call the steward may not support such a supposition, at least it warrants the inference that the evidence of the steward would, in some way, weaken the case of the bark in the matter of the light.

Another circumstance should be noticed as tending to confirm the opinion that the light of the bark was in bad condition at the time of the collision. That is the omission of the master, mate, and others of the bark's crew to prove the actual condition of the light after the blow. It is difficult to suppose that the condition of the light after the blow was not the subject of the attention of all on board the bark. And yet some say they did not see the light,—some of them, including the master, say that they did not look to see it,—but one, the pilot, says he did see it when he climbed up the main rigging, and it was then burning dim.

These views, which are the result of as careful an examination of the evidence as I am capable of making, compel me to the conclusion that at the time of the steamer's approach, the bark did not have a bright light displayed in her rigging, as required by law. For this omission she must be held guilty of fault, for it is entirely clear that a bright light displayed from the bark would have attracted the attention of the persons on the steamship in time to have enabled the steamer to avoid the bark.

I now pass other faults charged upon the bark to consider the faults charged upon the steamer. Of these, I find it unnecessary to express any opinion except as to her failure to discern the bark in time to avoid her. It will be conceded that if the bark without a light could have been seen from the steamer sooner than she was seen, and in time to avoid collision, the steamer was in fault. The evidence shows that at the time of the collision, the night was clear. The stars were shining, but the moon had set. It is described as "clear, not very clear, but clear enough"—"you couldn't see very far." It was too dark to read the time from a watch. On the part of the bark it is claimed that in such a night the lookouts stationed at the bow of the steamship could have seen the bark sooner than they did, and that fault must be found in the stationed lookouts for neglecting their duty. It is true, that the evidence of the pilot of the steamship conveys the impression that, in his opinion, the lookouts did not do their duty; but I find difficulty in arriving at that conclusion upon the evidence as it stands, and turn from the conduct of the seamen on the lookout to the action of the officers of the steamer, who were on the bridge and on the deck.

The steamship under their command was an immense vessel of 5,400 tons register, and 450 feet long—the largest vessel ever built, except the Great Eastern. She was proceeding in the night time at a rapid rate through the narrow channel of the swash, which is a fairway for vessels entering and leaving the harbor of New York. The circumstances called for the exercise of every reasonable exertion to discover objects ahead at the earliest moment. The master of the steamship and a lieutenant were on the bridge, and the 2d captain was on deck forward. The master had a night-glass with him, and he says, "All the officers had their glasses with them," yet no one of these officers resorted to his glass to scan the narrow channel ahead through which the steamship was then rapidly pushing her way. The master testifies positively that he was not looking with his glass, and is careful to say that, "it is the duty of the men on the watch to see anything ahead, and not those on the bridge." It is true that there were two seamen stationed on the lookout, but situated as this vessel was, it was not enough to double the lookout. Under the circumstances, it was the duty of the commander of this steamer to resort to any additional means at hand reasonably adapted to aiding him in ascertaining whether his course through the swash was clear. Such means were at hand and unused. The night-glass is an aid easily used on such an occasion. As is well known, it is constantly resorted to by navigators in the night. The evidence

of the pilot of the steamer, given in this very cause, shows that by using a night-glass, from the bridge even, the bark would have been seen sooner than it was possible for the lookouts to see her, and he undertakes to say that in fact he, by using his glass, did see the bark before she was reported by the lookout; but his testimony in this respect is contradicted and overthrown by the other witnesses for the steamship, who, as is conceded by the claimants, prove that no one upon the steamer saw the bark before she was seen by the lookout ahead, when she was under their bows. And it is 'not pretended that any officer made any use of his glass as they passed through the swash. This omission I consider to be negligence. To require that a night-glass be put in the hands of seamen stationed on the look-out would neither be reasonable nor useful. Nor would the use of a night-glass by an officer upon occasion dispense with the necessity of having a stationed lookout forward; but certainly it is not unreasonable to say that when several of the officers of this steamer were on deck, provided with glasses which would have enabled them to discern the bark before the lookouts could, and of which they made no use at all, they were guilty of negligence. I do not say that in every dark night, or that at all difficult places, the omission to use a night-glass would be negligence; but I do say that with such a narrow channel leading into such a harbor, to be passed by such a steamship as the Ville du Havre at her then rate of speed, it was negligence on the part of the officers not to use the glasses which they had with them, and which their own pilot swears would have enabled them to see the bark sooner than she was seen, and, as I cannot doubt, in time to make the slight change necessary to avoid her.

·I am aware that no statute exists requiring the use of the night-glass, and that its use on any occasion has not been in terms made obligatory by any rule of the maritime law, and I know of no adjudged case which has mentioned such a requirement.

But the rule of the maritime law which requires a good lookout to be kept, in principle covers the case. For the rigor of that rule rises with the power and speed of the vessel and the hazard of the navigation in which she is for the time engaged. Situated as this steamer was, the best pcssible lookout ahead was the only good lookcut. Here intelligent eyes, aided by the night-glass, and capable of examining every yard of the channel before them, were at hand. Had they been resorted to, it seems certain that the disaster would not have occurred; and for the omission to resort to this effective means the steamship must be accounted guilty of fault. Fault thus appearing on both vessels. the damages must be apportion· ed, and a decree will be entered accordingly.

VINACKE (REEVES v.). See Case No. 11,- 663